UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Alexander Lidge, Jr., | ) | C/A No. 4:12-2205-MGL-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| vs. | ) | |
| | ) | |
| Mohawk ESV, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

Plaintiff Alexander Lidge, Jr. ("Plaintiff" or "Lidge") filed this action on August 3, 2012,

seeking recovery against his former employer, Mohawk ESV, Inc. ("Defendant" or "Mohawk"), alleging

the following: (1) that Mohawk discriminated against him on the basis of race in violation of Title VII of

the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and (2) that Mohawk retaliated against

Plaintiff for alleged complaints of race discrimination in violation of Title VII. Mohawk answered the

Complaint, denying all material allegations. This matter is before the court on Mohawk's Motion for

Summary Judgment, ECF No. 44, to which Plaintiff filed a Response in Opposition, ECF Nos. 47 and

53, and Mohawk filed a Reply, ECF No. 55. Having considered those briefs and accompanying exhibits,

the undersigned submits this Report[1] recommending Defendants' Motion be granted and the case be

dismissed with prejudice in its entirety.

---

[1] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28
U.S.C. § 636 (b)(1)(B) and Local Civil Rule 73.02(B)(2)(g), D.S.C.  Because the Motion for Summary
Judgment is dispositive, this Report and Recommendation is entered for the district judge's
consideration.

I.     Factual Background

Mohawk, a Georgia-based manufacturer of carpet and other flooring products, operates several facilities in Bennettsville, South Carolina, including the "Oak River North Yarn" facility. *See* Aff. of Oak River North Yarn Senior Human Resources ("HR") Manager James Roberts ("Roberts") ¶ 2, ECF No. 44-2, and Roberts Dep. 13-15, ECF No. 44-3. Oak River North Yarn produces yarn used by Mohawk in manufacturing carpet. Roberts Dep. 15. Jamie Haselden was the Plant Manager at Oak River North Yarn. Roberts Dep. 22. Plaintiff began working with Mohawk in December 1991 and held several different positions. At the time of his September 2011 termination, Plaintiff was working as a Maintenance Technician. Maintenance Technicians—also known as fixers, mechanics, technicians, or techs—were responsible for fixing the yarn-producing machines and making sure they ran properly. Pl. Dep. 41, 45, 47, 49, 78, 148, ECF No. 44-4; Roberts Dep. 25; Haselden Dep. 63, ECF No. 44-7. The Maintenance Technicians generally split up the machines so that each Technician on the same shift was responsible for the same number of machines. Pl. Dep. 58. Plaintiff worked the night shift, and Maintenance Technicians typically worked on the same machines every shift. Pl. Dep. 49, 78.

Plaintiff's allegations focus on his treatment by Angela Campbell, who was his Shift Supervisor in 2006 and then again in 2011, just before his September 8, 2011 termination. Pl. Dep. 69-72; Roberts Dep. 48, 57, ECF No. 44-3; Incident Rpt., ex. 2 to Roberts Dep., ECF No. 44-3 at 31, 32.

A.  Events of 2006[2]

Plaintiff, who is African American, alleges that Campbell, who is also African American, treated him differently than similarly situated white employees. Pl. Dep. 75, 94; Campbell Dep. 89, ECF No. 44-5. As Shift Supervisor, Campbell was responsible for the operation of the CFN, or Cabling,

---

[2] Defendant submits allegations from 2006 may not be considered in Plaintiff's Title VII disparate-treatment claim. Def. Mem. 10-11. Plaintiff does not argue otherwise in his response to the Motion. Both parties discuss events of 2006 in connection with Plaintiff's Title VII retaliation claim.

Department during her assigned shift. Campbell Dep. 10; Roberts Dep. 18. In 2006, Campbell was the Supervisor in the CFN Department for the "B" night shift, on which Lidge worked as a Maintenance Technician. Campbell Dep. 24. Campbell never formally disciplined Plaintiff during this time period; she did counsel him and document various incidents when Plaintiff was disrespectful and/or questioned her authority. Campbell Aff. ¶ 3, ECF No. 44-6, and attach. 1, ECF No. 44-6 at 6-9. For example, Campbell noted that when she asked Plaintiff to do something, he responded, "You think I suppose to just jump up and go running over there because you said?" ECF No. 44-6 at 6 (Oct. 28, 2006 incident). On another occasion, Campbell recorded that Plaintiff told her she did not know what she was doing. *Id.* at 9 (Oct. 1, 2006 incident).[3] Campbell presented these notes she kept on Plaintiff to HR. Campbell Dep. 28.

Plaintiff testified that Campbell treated him unfairly by not always allowing him to take "the breaks that [he] should have gotten," by assigning him harder work, by restricting his access to tools, and not providing additional help when needed. Pl. Dep. 125, 127.

Plaintiff testified he first complained to management about Campbell around the same time she had begun supervising him (in 2006). Plaintiff testified that he complained to HR Manager Roberts, Haselden, and others about the alleged discriminatory treatment. Pl. Dep. 105-06, 115. Plaintiff stated he told Roberts that Campbell was picking on him because of his race. Pl. Dep. 115. Darlene Quick, another HR manager, advised Campbell that Plaintiff had complained about her, although Campbell was not told about the substance of his complaint. Campbell Dep. 31-32. Campbell indicated she never spoke with Plaintiff about his 2006 complaint. Campbell Dep. 33-34. Campbell testified she received a

---

[3] In his brief, Plaintiff indicated that, because Campbell had not issued "Corrective Actions" regarding the incidents she noted, Plaintiff "was precluded from being able to refute or respond to such allegations," although they were included in his disciplinary history and were presented to HR. Pl.'s Mem. 2, ECF No. 47.

reprimand from Plant Manager Haselden in 2010 regarding complaints of employees[4] regarding her management style. She was reprimanded and instructed not to issue any written warnings for one month. Campbell Dep. 29-30.

Plaintiff testified that he telephoned Roberts to discuss Campbell and that within weeks of that call, Campbell was no longer his supervisor. Pl. Dep. 122.

From approximately 2006 until the last three days of Lidge's employment, Campbell did not oversee Plaintiff's work at all. Pl. Dep. 91, 122-23; Campbell Dep. 93.

B.  Events of 2011

Campbell again became Plaintiff's Shift Supervisor in mid-August 2011. On or about August 24, 2011, Sharon Hepburn (African American), a Shift Coordinator,[5] was the Coordinator in Plaintiff's department and worked the same shift as Plaintiff. Hepburn Aff. ¶ 3, ECF No. 44-8.  In or around February 2011, Ray Moss became Department Manager of the CFN Department, where Plaintiff worked. Moss Aff. ¶ 2, ECF No. 44-9. During 2011, Moss instructed Shift Supervisors and Coordinators to change the machines on which the Technicians normally worked, aiming to decrease the number of accidents by reducing the number of times employees would need to cross the center aisle. Moss Aff. ¶ 3. Hepburn communicated this change in machine assignments to Lidge and his African-American coworker, Prentiss Covington. Hepburn Aff. ¶ 3; Pl. Dep. 85-86; Covington Aff. ¶ 5, ECF No. 44-11.

According to Defendant, Plaintiff then questioned Hepburn's authority to make that change, refused to work, and indicated he would go home unless those instructions had come from Moss. Hepburn Aff. ¶ 3 and attach., ECF No. 44-8 at 4 (copy of Hepburn's handwritten notes of incident). Hepburn contacted Plant Manager Haselden at home to ask how to handle Plaintiff's refusal to work. *Id.*

---

[4] The question to which Campbell was responding was not limited to complaints by Plaintiff. Campbell Dep. 29.

[5] The Shift Coordinator oversees a department when the Shift Supervisor is not present. Hepburn Aff. ¶ 2, ECF No. 44-8.

Haselden recalled having received a 2:00 a.m. telephone call about the issue, having spoken with Hepburn and Plaintiff, and having instructing Hepburn to allow Plaintiff to work his normal machines until they could discuss the matter the following day. Haselden Dep. 90-93. The following day, Haselden learned that other shifts had made the change and that Plaintiff had not wanted to make the change. Haselden Dep. 94. Haselden did not issue a Corrective Action or otherwise reprimand Plaintiff; rather, Haselden wanted Plaintiff to understand the reason the change was being made. Haselden explained the change to Plaintiff and noted no further incidents. *Id.*

Plaintiff has offered differing recollections of the events of August 24, 2011. In his deposition, Plaintiff denied he had been upset about the change, asserting he wanted to go home that morning because of personal problems. Pl. Dep. 101-05, ECF No. 44-4. Plaintiff testified that he was aware Hepburn had believed him to be upset over a work issue, but that he had been upset based on a personal matter. *Id.* at 102. In Plaintiff's handwritten submission to the United States Equal Employment Opportunity Commission (EEOC) regarding his charge of discrimination, Plaintiff had noted, "I ask[ed] to go home but [Hepburn] call[ed] the plant manager and he said, we can work the way we were doing our job, and that removed the [allegedly larger work-] load just that night." Pl. Dep. 192 & ex. 9 at CBS000085; ECF No. 44-4 at 62, 79.

On the following day, August 25, 2011, when Campbell had been working as Plaintiff's Shift Supervisor for three days, Pl. Dep. 69, Campbell discovered a production problem with the yarn and determined that the creel settings[6] needed to be changed for quality-control purposes, Campbell Dep. 54-55, ECF No. 44-5. As Shift Supervisor, Campbell was responsible for the yarn produced on her shift, and she had the authority to make and direct changes to the machine settings. *See id.*, Pl. Dep. 100-01,

---

[6] Creel settings control the amount of tension on the yarn during the production process. Pl. Dep. 52-53.

ECF No. 44-4; Roberts Dep. 51-53, ECF No. 44-3; Haselden Dep. 66, ECF No. 44-7. Campbell instructed Plaintiff to help change the creel settings. Pl. Dep. 156; Campbell Dep. 55.

Plaintiff's actions after that instruction are in dispute.[7] According to Campbell, Plaintiff asked her whether she had the authority to order the creel settings be changed. Campbell indicated Plaintiff said he would not make the change unless Plant Manager Haselden had given the instruction. Campbell Dep. 55, 90-91, ECF No. 44-5; ex. 2 to Roberts Dep., Campbell's Write-up of August 25, 2011 Incident, CBS000031, ECF No. 44-3 at 32 ("Campbell's Write-up"). Campbell advised Plaintiff that she did not need to speak with Haselden about the change, and that if Plaintiff did not do as instructed, she would send him home. Campbell Dep. 55. Campbell acknowledged that she did not consider Plaintiff's asking whether she had the authority to make the changes, in and of itself, to be insubordinate. Campbell Dep. 96. Plaintiff made the changes to the creel settings as directed by Campbell. Campbell Dep. 55, 64.

Campbell left the area and returned to find the machine on which Plaintiff had changed the creel settings was not operating. Pl. Dep. 159, Campbell Dep. 55-56. She asked Plaintiff whether he had notified the machine operator that it was ready to be started. Campbell Dep. 56. According to Campbell, Plaintiff responded that he would not start the machine up under those settings, and Campbell then instructed Plaintiff to leave for failing to follow instructions. Campbell Dep. 56. Campbell testified in deposition that, after she sent Plaintiff home, she assigned another employee, Prentiss Covington, to complete the procedure and start the machine. Campbell Dep. 64-65.

In his deposition, Plaintiff indicates he and Campbell "never had the discussion" regarding who had authorized the creel-setting changes and that he never informed Campbell he would only change the creel settings if Haselden had ordered it. Pl. Dep. 161-62. Plaintiff also denies having told Campbell he

---

[7] In considering this Motion, the court construes all facts in favor of Plaintiff, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Not all factual disputes will preclude summary judgment, *see id.* at 248, and the court sets out both versions of facts to the extent it finds them potentially relevant to consideration of Defendant's Motion.

would not start the machine back up at the changed settings "because [by the] time she got over, she started [the machine] up." Pl. Dep. 162-63. Plaintiff further denies Campbell having told him he would be sent home if he did not restart the machine, but that Campbell started the machine up herself and sent Plaintiff home for "no reason." Pl. Dep. 163. Plaintiff testified that he and Campbell did not have any discussions at all when she returned to the machine and turned it on. *Id.* Plaintiff indicated he had not restarted the machine because he had been waiting for Campbell to check it. *Id.* Plaintiff and Campbell concur that no one else was present during their conversation at the machine. Pl. Dep. 231; Campbell Dep. 56.

Plaintiff was suspended while Defendant investigated the events of that evening. Roberts, African-American Human Resources Manager, interviewed Campbell, Plaintiff, and other employees who were present during the shift (including John Quick, Prentiss Covington, and Marty Merriman). Roberts Dep. 40-42, ECF No. 44-3. Roberts testified that, from what he recalled of the information he gathered, Plaintiff had not started the machine as Campbell had requested. Roberts Dep. 58. Defendant's policy was that an employee's failure to follow instructions was a terminable offense. *Id.* at 40.

Based on the evidence demonstrating that Plaintiff had defied a direct order from his supervisor, Roberts, Plant Manager Haselden (White), and Department Manager Moss (African American) made the decision to terminate Plaintiff's employment. Roberts Dep. 40, 44-45, 99-100; Haselden Dep. 55-57. Campbell testified that she signed a Personnel Action Request form on September 7, 2011, suggesting Plaintiff be terminated. Campbell Dep. 67, ECF No. 53-1; *see* Personnel Action Request form at ECF No. 53-5 at 1. Campbell explained that she made the recommendation when discussing the matter with Department Manager Moss. *Id.* Campbell then noted that HR would review the request and make decisions. *Id.* at 67, 92. On September 8, 2011, Moss signed the Personnel Action Request form, indicating Department Manager approval of the termination. ECF No. 53-5 at 1.

While the investigation was ongoing, Plaintiff made telephone calls to Moss (African American); Haselden (White); Roberts (African American); the Plant Manager at Oak River South, Tom Llaneza (White); Hendrix (White); and various individuals at Defendant's corporate office. Pl. Dep. 68-69, 76, 96, 164, 167-168; Roberts Dep. 58, 99. Hendrix traveled to Bennettsville to meet personally with Lidge; Hendrix also spoke with Campbell. Pl. Dep. 169; Campbell Dep. 79. After Hendrix's review was complete, on September 8, 2011, Roberts advised Plaintiff that his employment was terminated. *See* Roberts Dep. 37. Three of the four individuals involved in the decision to terminate Plaintiff's employment were African American: Campbell, Moss, and Roberts.

C.  Allegations of Protected Activity

Plaintiff alleges that he first complained about Campbell when she supervised him in 2006. Pl. Dep. 105. Plaintiff indicated he had complained to Roberts and Llaneza that Campbell was treating him unfairly on the basis of his race. Pl. Dep. 105-06, 115, 130-31, 136.

In his deposition, Plaintiff testified that "on day two of working with Ms. Campbell again" in August 2011, he complained to Department Manager Moss that he believed Campbell was treating Plaintiff differently because he was African American. Pl. Dep. 136, 144.[8]

---

[8] Defendant cites to Plaintiff's testimony regarding this 2011 complaint to Moss regarding disparate treatment. Def. Mem. 8-9. However, in opposing Defendant's Motion as to his Title VII retaliation claim, Plaintiff does not argue he made any complaints in 2011 that qualified as "protected activity." Further, Defendant indicates Plaintiff testified he discussed "the race issue" with Regional HR Director Jerry Hendrix. Def. Mem. 9 (citing Pl. Dep. 175). That page of Plaintiff's deposition recounts a conversation with Hendrix ("Jerry"), but it includes no reference to a race-based complaint. *See* Pl. Dep. 58, ECF No. 44-4. Although Plaintiff's response to Defendant's Motion generally indicates in the facts section that he "attempted to complain about [the incident that led to his termination], but the issue was not addressed with Plaintiff," Pl. Mem. 4, nowhere does he allege he made specific comments to Hendrix in 2011 regarding Campbell's alleged disparate treatment of him. *Cf.* Pl. Mem. 10-12 (arguing Campbell was aware of Plaintiff's complaints about her in 2006 and that she "did not get the opportunity to retaliate against [him] until she became his supervisor again in 2011[.]").

D.  Additional Facts

The workforce at Mohawk Oak River North Yarn where Plaintiff worked is and was predominantly African American. In 2011, almost 73 percent of the workforce was African American, and ten of the 15 Maintenance Technicians in the CFN Department were African American. Roberts Aff. ¶ 3, ECF No. 44-2.

During 2010 and 2011, Mohawk discharged one other employee for failing to follow instructions, and that employee was White. Roberts Aff. ¶ 4.

Plaintiff filed a charge of discrimination with the EEOC alleging race and sex discrimination and retaliation on November 10, 2011. *See* ECF No. 44-4 at 73.  The EEOC issued a Dismissal and Notice of Rights to Plaintiff on May 10, 2012. *Id.* at 74.

II.    Discussion

A.  Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson*, 477 U.S. at 255. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact. A party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII discrimination). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

B.    Analysis

1.    Title VII Race Discrimination Claim[9]

A Title VII plaintiff may "avert summary judgment" through "two avenues of proof." *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc). As the Fourth Circuit Court of Appeals explained in *Diamond v. Colonial Life & Accident Insurance Co.*, 416 F.3d 310 (4th Cir. 2005):

> A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision. [*Hill*, 354 F.3d at 284.] Pursuant to the 1991 Act, the impermissible factor need not have been the sole factor. As long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice. *See* 42 U.S.C.A. § 2000e-2(m). Alternatively, a plaintiff may "proceed under [the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)] 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible

---

[9] As set out above, Plaintiff complained in deposition about disparate treatment by Campbell in 2006. *See, e.g.*, Pl. Dep. 125, 127 (complaining he did not get some scheduled breaks, he had to request company tools, and he was assigned more difficult work than Whites in his job position). Defendant submits the court should not consider these complaints because they were not timely considered in this litigation and because they were not adverse employment actions for purposes of establishing a prima facie Title VII discrimination claim. Def. Mem. 10-11. Plaintiff did not respond to this portion of Defendant's Motion, nor did he otherwise focus on these specific allegations in setting out his argument regarding his Title VII discrimination claim. Accordingly, Plaintiff has abandoned any reliance on such evidence to support his termination claim. *Eady v. Veolia Transp. Servs., Inc.*, 609 F. Supp. 2d 540, 560-61 (D.S.C. 2009) (finding plaintiff in employment matter waived or abandoned claim raised in complaint and discussed in plaintiff's deposition testimony by failing to address that claim in defending against summary judgment); *see also Burns v. Air Liquide Am., L.P.*, 515 F. Supp. 2d 748, 759 n.9 (S.D. Tex. 2007) (finding plaintiff abandoned arguments as to putative comparators and did not defend equal pay claim).

In any event, because these events took place more than 300 days before Plaintiff submitted his charge to the EEOC (November 11, 2011), the court concurs with Defendant that they are not properly considered as part of that claim. *See* 42 U.S.C. § 2000e-5(e)(1). Further, the court agrees with Defendant that Plaintiff's claims regarding break-taking, tool-availability, and workload are not "adverse employment actions" for purposes of setting forth a prima facie case of disparate treatment. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375-376 (4th Cir. 2004) (adverse employment action requires detrimental effect on terms and conditions of employment, such as decrease in compensation, job title, level of responsibility, or opportunity for promotion; less appealing responsibilities are not adverse actions).

reason for taking an adverse employment action is actually a pretext for discrimination."
*Hill*, 354 F.3d at 285.

416 F.3d at 318 (additional citation information added).

Pursuant to the *McDonnell Douglas* burden-shifting framework, once plaintiff establishes a prima facie case of a violation of Title VII, the burden shifts to defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Here, Plaintiff proceeds under the *McDonnell Douglas* proof scheme. To establish a prima facie case of race discrimination, Plaintiff must prove the following four elements: (1) he was a member of a protected class (here, African American); (2) he suffered an adverse employment action; (3) at the time of the adverse action he was performing up to his employer's expectations; and (4) the circumstances gave rise to an inference of unlawful discrimination. *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011) (in failure-to-promote context). In a discriminatory discharge matter concerning the enforcement of employee disciplinary measures, the Fourth Circuit noted the inference of unlawful discrimination (factor four) could be established by showing that "other employees who were not members of the protected class were retained under apparently similar circumstances." *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir. 2002).

In moving for summary judgment, Defendant briefly argues Plaintiff cannot set forth his prima facie case of race discrimination because "he was not performing satisfactorily; he defied a direct order from his supervisor, and he was discharged for such conduct." Def. Mem. 12. Although Defendant does not concede Plaintiff has established a prima facie case of discrimination, it does not elaborate on this

argument by citing to specific record facts or by citing informative legal precedent. Rather, Defendant shifts to discussing the burden-shifting framework as if the prima facie case has been established. Defendant argues that the same evidence—that Plaintiff defied a direct order from his supervisor—sets forth its legitimate, nondiscriminatory reason for terminating Plaintiff. *Id.* Defendant then discusses the record evidence, arguing Plaintiff has not set forth evidence sufficient to cast doubt on the reason for Plaintiff's termination.

In response, Plaintiff submits that he was performing satisfactorily, citing to the deposition of Plant Manager Haselden. Pl. Mem. 7, Haselden Dep. 96-97, ECF No. 53-3. Plaintiff does not further discuss this argument specifically, nor does he offer other specific evidence in support of this element of his prima facie discrimination case. Rather, Plaintiff, too, then focuses on Defendant's proffered nondiscriminatory, legitimate reason for his termination and attempts to defeat summary judgment by offering evidence that the allegedly nondiscriminatory reason for his termination was pretextual. Pl. Mem. 7-10.

Review of the testimony cited indicates that Haselden testified that Plaintiff performed his mechanic's duties well. Haselden Dep. 97 ("[A]s far as a Mechanic doing his job, [Plaintiff] did a great job."). Review of the deposition reveals however, that Haselden's response was qualified, and he testified the "only issue[s]" Plaintiff had were "the incident with Sharon [Hepburn] and the incident with Angela [Campbell]." *Id.* at 96-97. Haselden noted he did not think there would be anything negative in Plaintiff's file regarding his "job performance." *Id.* at 97.

In determining whether an employee has met an employer's legitimate job expectations, it is the employer's perception that is relevant, not the employee's self-assessment. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (citing *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996)). "The relevant time to evaluate [ ] an employee's performance is at the time of the adverse

action." *Wells v. Briggs Constr. Equip. Inc.*, C/A No. 3:08-3634-JFA-PJG, 2010 WL 2991673, at *4 (D.S.C. May 12, 2010) (citing *Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005)), *adopted,* 2010 WL 2991681 (Jul. 28, 2010).

The undersigned is of the opinion that the testimony of Haselden to which Plaintiff refers is insufficient to establish his prima facie case that he was performing up to Defendant's legitimate employment expectations at the time he was terminated. Haselden's testimony, when considered in context, is not tantamount to stating Plaintiff's performance was acceptable at the time of his termination. Although Haselden testified there were no complaints with how Plaintiff performed the technical aspects of his position as a mechanic, he also recounted the issues Plaintiff had with superiors Hepburn and Campbell. Haselden Dep. 96-97.

Nonetheless, the court notes that some Fourth Circuit cases considering claims of disparate discipline using the *McDonnell Douglas* method of proof do not include an element of meeting expectations. *See, e.g.*, *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 336 (4th Cir. 2011) (setting out the following factors necessary for a plaintiff claiming disparate discipline to establish a prima facie case: (1) he is a member of a protected class under Title VII; (2) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) he suffered more severe discipline for his misconduct as compared to those employees outside the protected class). Plaintiff focuses much of his wrongful termination claim on ways he was discriminated against by being disciplined differently from others not in his protected class. Accordingly, the court considers whether similarly situated employees outside of Plaintiff's protected class were treated differently.

Review of the arguments advanced both by Plaintiff and Defendant reveals they did not analyze the relative similarity of discipline meted out to other employees in the context of Plaintiff's prima facie case; rather, they analyzed it in considering whether Plaintiff could satisfy his burden of demonstrating

Defendant's proffered reason for terminating Plaintiff was mere pretext for a discriminatory reason for doing so. *See, e.g.,* Def. Mem. 12-14, Pl. Mem. 7-10, Def. Reply 2. Because Defendant, as moving party, focused on its nondiscriminatory reason for terminating Plaintiff and argued Plaintiff could not demonstrate pretext, the court assumes without deciding that Plaintiff has set forth a prima facie case of racial discrimination.[10]

Defendant maintains Plaintiff's "insubordinate refusal to start the machine with the creel settings directed by Campbell" was a legitimate, nondiscriminatory reason for Plaintiff's termination. Def. Mem. 12. Here, assuming Plaintiff established a prima facie case of racial discrimination, the undersigned finds he has not set forth sufficient evidence to demonstrate Defendant's explanation for his termination was merely pretextual. *See Atkins v. Holder*, 529 F. App'x 318, 320 (4th Cir. 2013) (noting if a plaintiff puts forth a prima facie, defendant must offer a nondiscriminatory explanation for the termination and then the burden of proof returns to plaintiff to show the employer's proffered explanation is pretextual) (Title VII); *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2005) (same in retaliatory discharge context). As Defendant notes, courts are not to second-guess an employer's decision on human resources matters, so long as such decisions are not based on an unlawful reason. *See* Def. Mem. 12-13. "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity. . . ." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir.

---

[10] In any event, much of the evidence the parties discuss in this pretext argument, concerns the treatment of Plaintiff as compared with other employees. Accordingly, this analysis may also be considered in determining whether Plaintiff satisfied that portion of his prima facie case concerned with the "inference of discrimination"—whether Plaintiff was treated less favorably than similarly situated employees who were not African American. *See generally Merritt*, 601 F.3d at 294-95 ("Notwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of "the ultimate question of discrimination *vel non*.'") (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983)). *See generally Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 516 (4th Cir. 2006) (noting flexibility of *McDonnell Douglas* framework and finding "no impermeable barrier" preventing parties from using the same evidence at different stages of the framework).

2006). "[I]t is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Plaintiff cannot show that Defendant's stated reason for terminating him was not the real reason for his discharge.

In arguing Defendant's stated reason for terminating him was merely pretextual, Plaintiff proffers evidence of several alleged comparators whom he submits were treated differently from him because they "were allowed four strikes before termination and many work related offenses[,]" before being terminated. Pl. Mem. 7 (citing personnel records of C.B., T.S., and I.E., available at ECF Nos. 53-8 and 53-9). In comparison, Plaintiff submits he was terminated for allegedly failing to follow instructions in spite of his "seemingly overall positive work history." Pl. Mem. 7. He claims that history "was disregarded because of his questioning a change and following policy." *Id.* However, review of the records concerning Plaintiff's proffered comparators does not support Plaintiff's argument that Campbell treated white employees differently from Plaintiff.

Plaintiff offers the example of white employee C.M., a CFN technician. On October 22, 2010, Campbell prepared an incident report regarding his "Defective workmanship," which she described as his failure to "change twist gear on 1 Front Changeover/no changeover paperwork." ECF No. 53-8 at 3. C.M. also had issues with attendance in 2010, 2011, and 2013 (ECF No. 53-8 at 2, 6, 11-13). C.M.'s file also contains two "Records of Conversation" another supervisor had with C.M. in 2012 regarding his failure to follow procedures during changeovers and about "strobing" twice per night. ECF No. 53-8 at 8-9. Plaintiff characterizes the 2010 defective-workmanship issue as an intentional failure to follow instructions and suggests C.M. was treated more favorably because his non-attendance-related issues were not considered "intolerable" offenses. Pl. Resp. 4.

In response, Defendant provides another affidavit from HR Manager Roberts, in which he explains Defendant's policy regarding infractions and corrective actions. Roberts 2d Aff., ECF No. 55-1. Roberts provides a copy of the Corrective Action Policy, ECF No. 55-1 at 3-7, and explains that "minor" infractions are handled with corrective actions, and an employee who receives four corrective actions during a one-year period may be discharged. Roberts 2d Aff. ¶ 3. Employees who commit "'intolerable,' or major policy violations, may be discharged immediately without prior warnings." *Id.* "Insubordination, or 'refusal to perform the legitimate duties associated with one's job,' is considered an intolerable offense." *Id.*

"[T]o be similarly situated, a 'plaintiff must establish that other employees were similarly situated in all relevant respects; that they dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Poirier v. City of Myrtle Beach*, No. 4:11-1731-JMC-TER, 2013 WL 81166, at *14 (D.S.C. Jan. 16, 2013) (quoting *Ward v. City of N. Myrtle Beach*, 457 F. Supp. 2d 625, 643 (D.S.C. 2006) (finding plaintiff had not met pretext burden of showing similarly situated employee treated more favorably) *adopted,* 2013 WL 809593 (Mar. 5, 2013). In determining whether the conduct of a plaintiff is comparable in seriousness to that of employees outside the protected class ("comparators"), a court is to "consider the gravity of the offenses on a relative scale." *Moore v. City of Charlotte,* 754 F.2d 1100, 1107 (4th Cir. 1985) (internal quotation omitted). Exact similarity between offenses is not required. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993) (noting the "reality that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same circumstances.").

Review of the documentation Plaintiff supplies in support of his argument that C.M. was similarly situated but treated differently reveals that C.M.'s 2010 Corrective Action was not the result of

C.M.'s refusal to do what his supervisor instructed. Rather, Campbell indicated C.M. failed to change twist gears as indicated on a specification sheet, thereby causing defective product—a "mix." ECF No. 53-8 at 4. Campbell indicated this failure was discovered by another employee some six hours later. *Id*. C.M. was not a similarly situated white employee whom Campbell treated differently. Campbell gives no indication that C.M. refused to change something Campbell expressly instructed he do. Plaintiff's argument that this incident was a "failure to follow instructions" that should have been treated as an intolerable offense and resulted in immediate termination is not supported by the record evidence. Nothing in the record evidences that C.M.'s failure to change gears was anything other than an accident or unintentional oversight. None of the other information provided regarding C.M. provides such proof, either.

Nor do the other white employees to whom Plaintiff compares himself provide evidence to show pretext. *See* Pl. Mem. 4 ("[O]ther white employees, T.S., a maintenance tech, and I.E., an operator, were given the opportunity to obtain 4 written slips within 1 year, before termination was recommended."), *id.* at 7 ("other employees were allowed four strikes before termination and many work related offenses") (citing generally to personnel records, available at ECF No. 53-9). From the only record evidence Plaintiff provided regarding these employees, the court can determine only that: a Twister Operator was terminated on March 3, 2013 and that Campbell recommended termination because the employee had received "4 written slips within 1 year," ECF No. 53-9 at 1-2; and a Maintenance Tech supervised by Eleanor Pauling was terminated in 2006 for receiving 4 incident slips within one year, *id.* at 3 (form also generally rates this employee's initiative, work quantity and quality as "fair," and his or her job attitude and attendance as "poor"). Plaintiff provides no information concerning the particular infractions for which these employees were written up before being terminated, nor does he provide record evidence that these employees were white. In its Reply, Defendant indicates the Twister

Operator, "I.E.," was "discharged for receiving four corrective actions in one year: three for attendance and one for performance (improper yarn mix)" and the Maintenance Tech., T.S., was terminated for receiving four attendance-related corrective actions in one year. Def. Reply 4.

Plaintiff has not provided sufficient evidence to support his argument that this information somehow demonstrates discriminatory intent toward him and that the stated reason for his being terminated was pretextual. *See Reeves*, 530 U.S. at 143 (holding plaintiff has burden of demonstrating by preponderance of evidence that defendant's proffered legitimate reason was mere pretext for actual, unlawful reason). Rather, Plaintiff has presented evidence only that these employees were terminated for receiving four corrective actions within one year. Plaintiff has not provided information explaining what behavior/infractions were involved, nor any details regarding the underlying facts regarding these individuals. Considering the reasons for those write-ups provided by Defendant on Reply highlights that these employees were not written up for insubordination or anything comparable. The court agrees with Plaintiff that "precise equivalence in culpability" is not the ultimate question. *See* Pl. Mem. 9. Nonetheless, as Plaintiff notes in his brief, a successful plaintiff must provide information regarding employees who received more favorable treatment for involvement in acts of "comparable seriousness." *Id.* (internal quotations omitted). Plaintiff has not provided information that these proffered comparators were involved in comparable acts. Plaintiff has not provided sufficient evidence to demonstrate Defendant's proffered reason for terminating him was mere pretext for unlawful discrimination.[11]

---

[11] In an apparent attempt to demonstrate similarity between Plaintiff and the proffered comparators, Plaintiff also cites to Campbell's testimony that she supervised employees with many job titles, could issue Corrective Actions to any of them, and would submit suggestions of terminations to her department manager and HR. Pl. Mem. 9 (citing Campbell Dep. 14, 67) ("[A]ll of the employees would be similarly situated as they were laborers subjected to upper management's administration."). Plaintiff cites no legal authority for this proposition. Even assuming, but not finding, such an argument has legal merit, Plaintiff has not provided sufficient evidence to show pretext. Even if these comparators were sufficiently similar in job title and supervision, there is no evidence that they were treated more favorably than Plaintiff for comparably serious acts.

Plaintiff also attempts to prove pretext by pointing to Campbell's personnel records to demonstrate Campbell was merely reprimanded, not terminated, when she failed to follow instructions given to her by her superiors. Pl. Mem. 7 (citing to Campbell Corrective Action, available at ECF No. 53-6). This argument lacks merit without even considering and comparing Campbell's actions for which she was reprimanded with Plaintiff's actions because both Campbell and Plaintiff are African American.[12] As members of the same protected class, their relative treatment can provide no useful evidence to demonstrate discriminatory intent or treatment. *See generally McDonnell Douglas*, 411 U.S. at 804 (noting pretext may be shown through evidence that employees *not* in plaintiff's protected class were treated differently under similar circumstances).

Plaintiff also briefly argues Campbell, an African American herself, "engaged in same race discrimination long recognized by courts traditionally in cases where lighter skinned blacks had a history of discriminating against darker skinned blacks." Pl. Mem. 8 (citing *Ecklund v. Fuisz Tech*., 905 F. Supp. 335 (E. D. Va. 1995)). Title VII prohibits discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Race discrimination and color discrimination are distinct claims. *See Bryant*, 288 F.3d 124 at 132-33 n.5 ("Color discrimination arises when the particular hue of the plaintiff's skin is the cause of discrimination, such as in the case where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American individual."). Plaintiff has not alleged color discrimination in this litigation, nor did he allege it in his charge of discrimination. *See* ECF No. 44-4 at 73 (EEOC Charge in which Plaintiff indicated he believed he had "been discriminated against based on my race (Black), my sex (Male) and retaliated against for engaging in protected activity."). Plaintiff's failure to assert a claim of color discrimination at

---

[12] As discussed below, Plaintiff also briefly argues Campbell discriminated against him because he was a darker-skinned African American than she. Pl. Mem. 8. The record contains no evidence of the relative skin colors of Plaintiff, Campbell, or others. Accordingly, any comparison between discipline of Campbell and Plaintiff would be consideration of two members of the same protected class.

the administrative level prevents him from raising it at the motions stage of this litigation. *See Bryant*, 288 F.3d at 132-33 & n.5 (declining to consider claims of color discrimination raised for the first time in litigation when they had not been raised before the EEOC). Further, the record contains no information regarding the relative skin colors of the relevant individuals. Plaintiff may not now pursue a claim of color discrimination, nor does this argument provide evidence sufficient to permit him to survive summary judgment on his race discrimination claim.

Plaintiff also submits evidence in the form of unsworn statements from "a number of disgruntled employees who complained about the unfair treatment" by Campbell, arguing Defendant cannot escape liability for the "pattern of discrimination exhibited in the differing discipline by [Campbell] and Defendant." Pl. Mem. 8, *see id.* at 8-9 and ex. G, available at ECF No. 53-7. As an initial matter, the court agrees with Defendant that these statements are inadmissible and should not be considered by the court at this stage. *See* Fed. R. Civ. P. 56(c)(2) (party may object that "material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

Defendant objects to the employee statements provided by Plaintiff, arguing they are not sworn or otherwise authenticated and should not be considered. Def. Reply 7. Defendant further argues the statements contain hearsay and conclusory allegations and do not indicate the witness has personal knowledge of relevant facts. *Id.* Rule 56(c)(4) of the Federal Rules of Civil Procedure requires that "[a]n affidavit . . . used to . . . oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."

The undersigned agrees. *See, e.g.*, ECF No. 53-7 at 2 (stating, *inter alia*, "Management sucks. Working under Angela Campbell was a nightmare." and noting rumors regarding Campbell and others). These statements should not be considered. *See Myers v. Wood*, C/A No. 0:12-cv-422-JFA, 2013 WL 4823171 (D.S.C. Sept. 9, 2013) (noting plaintiff could not rely on inadmissible evidence to defeat

summary judgment) (citing *Md. Highways Contractors Ass'n v. State of Md.,* 933 F.2d 1246, 1251 (4th Cir. 1991)).

Further, even if the statements were properly authenticated, they are not relevant to the issues presented in Plaintiff's case. Plaintiff suggests the statements go to demonstrating a "pattern" of Defendant's disparate treatment of African-American employees. As an initial matter, "[t]here is no private, non-class cause of action for 'pattern and practice' discrimination under Title VII in the Fourth Circuit." *Lott v. Westinghouse Savannah River Co., Inc.,* 200 F.R.D. 539, 553 (D.S.C. 2000). To the extent Plaintiff seeks to have this evidence considered as evidence in support of demonstrating the proffered reason for his own termination was pretext for discriminatory intent, such information is not relevant. None of the statements provide any evidence relating to Plaintiff, his employment by Defendant, or his supervision by Campbell. Therefore, these inadmissible statements provide no support for any of the allegations at issue in this matter and should be disregarded.[13]

Finally, to the extent Plaintiff seeks to have the court deny Defendant's Motion for Summary Judgment based on a supposed issue of fact as to whether Plaintiff in fact was "insubordinate" to Campbell and refused to start the machine despite her order, such an argument is unavailing. Unlike some civil disputes, in which any genuine issue of material fact may be sufficient to defeat summary judgment, *see Anderson,* 477 U.S. at 249, Plaintiff's discrimination claim is considered based on the burden-shifting framework set forth above. Defendant has unquestionably set forth a legitimate, non-discriminatory reason for terminating Plaintiff. Accordingly, the burden is shifted back to Plaintiff to show that Defendant's proffered explanation is pretextual. As noted above, the court is not to determine whether the proffered reason "was wise, fair, **or even correct**, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette,* 133 F.3d at 299 (emphasis added). Plaintiff must

---

[13] Even if considered, the conclusory information contained in the statements does not demonstrate the reason given to Plaintiff for his termination was pretext for an unlawful discriminatory motive.

prove "*both* that the reason was false, *and* that discrimination was the real reason" for the challenged conduct. *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377-78 (4th Cir. 1995) (emphasis in original). Plaintiff has not done so here. Rather, the record indicates Roberts, who had interviewed witnesses in considering whether Plaintiff should be terminated, testified that he recalled Plaintiff had not started the machine as Campbell had requested. Roberts Dep. 40-42, 58. Additionally, on August 24, 2011, the day before the issue with Campbell, Plaintiff had questioned another of his superiors. Further, Campbell, the alleged discriminator, and two of the decision-makers (Moss and Roberts) are also African American, and there is no evidence that they have any racial animus against members of their own race. Campbell Aff., ¶ 4, ECF No. 44-6; Roberts Aff. ¶ 5, ECF No. 44-2; Moss Aff. ¶ 6, ECF No. 44-9. *See United States v. Crosby,* 59 F.3d 1133, 1135 n.4 (11th Cir. 1995) (noting when decision-maker is same race as plaintiff, plaintiff should present evidence that such decision-maker held members of his or her own race to a higher standard of conduct than those of other races); *Demesme v. Montgomery Cnty. Gov't*, 63 F.Supp.2d 678, 683 (D. Md. 1999) (Title VII) ("The fact that the decision makers were of the same protected class [as the plaintiff] suggests no discriminatory motivation.").

Plaintiff cannot meet his burden of establishing pretext. He has not provided evidence of racial animus from which a reasonable juror could determine an illegal discriminatory motive was the reason he was terminated.   Defendant's Motion should be granted as to Plaintiff's claim of wrongful termination.

### 2.   Title VII Retaliation Claim

Plaintiff also raises a claim of retaliation pursuant to Title VII. A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. Pursuant to this framework, once the plaintiff establishes a prima facie case of a

violation of Title VII, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt*, 601 F.3d at 294. If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Absent direct evidence proof of retaliation, in order to establish a prima facie case for retaliation under Title VII, a plaintiff must show the following: "(1) []he engaged in a protected activity; (2) the employer took an adverse employment action against [him]; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2011) (internal quotation omitted).

If Plaintiff is able to establish a prima facie case for retaliation, Defendant can rebut the presumption by articulating a legitimate non-retaliatory reason for its action. Discussing a defendant's burden, the court has explained: "What shifts is merely a burden of producing admissible evidence (something more than a pleading) that would, if believed, be legally sufficient to justify a judgment for the defendant." *Taylor v. Ingles Markets*, C.A. No. 802407227, 2004 WL 3591133, *5 (D.S.C. Dec. 13, 2004) (citing *Burdine*, 450 U.S. at 255). The employer, however, does not have the burden of persuading the court that it was actually motivated by the proffered reason. *Id.* "The employer's burden is satisfied if he simply 'explains what he had done' or 'produce[es] evidence of legitimate, nondiscriminatory

reasons.'" *Williams v. Sonoco Prods. Co.*, C.A. No. 81-1469-0, 1982 WL 423, at *3 (D.S.C. Nov. 8, 1982) (citing *Bd. of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 25 (1978)). A plaintiff bears the final burden of proving that the reason given by a defendant is a pretext for unlawful retaliation. *Reeves*, 530 U.S. 133. In *Reeves*, the Supreme Court clarified a plaintiff's burden to show pretext once the employer articulates a legitimate reason for its adverse action. The Court held that a plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. *Reeves*, 530 U.S. at 143. "The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." *Reeves*, 50 U.S. at 146 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)). Recently, the United States Supreme Court clarified that, in the Title VII retaliation context, a plaintiff must prove retaliation was the but-for cause of the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). In other words, the successful plaintiff in a Title VII retaliation suit must show that the complained-of injury would not have occurred "but for" the alleged retaliatory motive. *Id.; see also id.* at 2524-25. In so holding, the Court rejected the argument that a Title VII retaliation claimant had to establish the lessened "motivating-factor" causation standard applicable to some status-based Title VII causes of action. *See* 133 S. Ct. at 2533-34. *See also Maliik v. Sebelius*, __ F. Supp. 2d __, No. PWG-12-1725, 2013 WL 4559516, at *16 (D. Md. Aug. 28, 2013) (discussing *Nassar* and explaining the but-for causation standard "means that the employer would not have taken the adverse employment action against the plaintiff if the employer were not trying to retaliate against the plaintiff for engaging in a protected activity.").

Plaintiff has not offered any direct evidence of retaliation, so the court considers his Title VII claims under the burden-shifting framework as detailed above. Plaintiff submits Defendant retaliated

against him for making complaints of discriminatory treatment by Campbell. In moving for summary judgment, Defendant references complaints Plaintiff made in 2006 and 2011, and, for purposes of its Motion only, Defendant "accepts [Plaintiff's] unsupported allegations that he complained in 2006 and 2011 of discriminatory treatment by Campbell." Def. Mem. 15 n.8. Defendant agrees Plaintiff suffered an adverse employment action when he was terminated in 2011. Defendant submits it is entitled to summary judgment because Plaintiff cannot establish the third element of his prima facie case—that his complaints were the but-for cause of his 2011 termination. Def. Mem. 14-16.

Plaintiff alleges that he first complained about Campbell when she supervised him in 2006. Pl. Dep. 105. Plaintiff indicated he had complained to Roberts and Llaneza that Campbell was treating him unfairly on the basis of his race. Pl. Dep. 105-06, 115, 130-31, 136.

Defendant argues the five-year period that lapsed between Plaintiff's complaints about Campbell in 2006 and his 2011 discharge negates any possible connection between his purported protected activity and the adverse action. Def. Mem. 15-16. In response, Plaintiff argues Campbell "did not get the opportunity to retaliate against Plaintiff until she became his supervisor again in 2011, and it is clear from Plaintiff's history that the only major incidents attributed to Plaintiff's personnel file were in 2006 and 2011, when [] Campbell supervised Plaintiff." Pl. Mem. 10. Plaintiff submits this creates an issue of fact for a jury to consider whether there was a causal connection between the 2006 complaints and the 2011 termination. *Id.* He does not otherwise specifically respond to Defendant's argument that the time-lapse between the 2006 complaint and the 2011 termination causes his retaliation claim to fail.

The court agrees with Defendant. Both the Supreme Court and the Fourth Circuit have held as a matter of law that such a lapse of time between protected activity and adverse employment action is insufficient to establish causation. *See, e.g., Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (finding a 20-month delay too long to establish a causal connection and noting cases that found three-to-

four-month delays too remote to establish causation based on temporal proximity); *cf. King,* 328 F.3d at

151 n.5 (noting a delay of two months and two weeks long can be enough to weaken significantly the

inference of causation between the two events). The undersigned recommends a finding as a matter of

law that Plaintiff cannot set forth a prima facie case of retaliation based on his 2006 complaint.[14]

Defendant also briefs argument regarding Plaintiff's alleged 2011 complaints about Campbell's

treatment of him and other African-American employees. Def. Mem. 9, 16. Defendant references two

alleged "protected activities" in 2011—that Plaintiff complained both to Department Manager Moss (on

the second day Campbell was back to supervising him, which was the day before he was terminated) and

to Regional HR Director Hendrix (while Plaintiff was on suspension and Defendant investigated the

matter) about Campbell and how she treated him differently from White employees. In his deposition,

Plaintiff briefly testified that he complained to Department Manager Moss that he believed Campbell

was treating Plaintiff differently because he was African American. Pl. Dep. 144. Although Defendant

indicates Plaintiff testified he discussed "the race issue" with Regional HR Director Jerry Hendrix

during his suspension, Def. Mem. 9 (citing Pl. Dep. 175), the court does not find testimony specifically

relating to a complaint that Campbell's treatment of him was race-based.

In any event, in defending his retaliation claim, Plaintiff makes no reference to any 2011

complaints to any representative of Defendant that qualified as "protected activity." Although Plaintiff's

response to Defendant's Motion generally indicates in the facts section that he "attempted to complain

about [the incident that lead to his termination]," Pl. Mem. 4, nowhere does he allege he made specific

comments to Moss or Hendrix in 2011 regarding Campbell's alleged race-based disparate treatment of

him. *Cf.* Pl. Mem. 10-12 (arguing Campbell was aware of Plaintiff's complaints about her in 2006 and

---

[14] The court also notes that, although Campbell acknowledges an HR employee told her Plaintiff had left a note complaining about her, Campbell Dep. 31, the record contains no evidence that Campbell was aware Plaintiff's complaint against her concerned race discrimination. *See* Campbell Dep. 31-33.

that she "did not get the opportunity to retaliate against [him] until she became his supervisor again in 2011[.]"). Accordingly, Plaintiff has abandoned any claim he participated in protected activity in 2011, and the court need not further discuss his retaliation claim. *See Eady*, 609 F. Supp. 2d at 560-61 (finding plaintiff in employment matter waived or abandoned claim raised in complaint and discussed in plaintiff's deposition testimony by failing to address claim in defending against summary judgment); *see also Burns*, 515 F. Supp. 2d at 759 n.9 (finding plaintiff abandoned arguments as to putative comparators and did not defend equal pay claim).

Defendant's Motion for Summary Judgment should be granted as to Plaintiff's claim of retaliation in violation of Title VII.

III.     Conclusion

For the foregoing reasons, the undersigned recommends that Defendant's Motion for Summary Judgment, ECF No. 44, be granted and this case be dismissed.

IT IS SO RECOMMENDED.

January 15, 2014                                                      Kaymani D. West
Florence, South Carolina                                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**